IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

GALA WRIGHT,                          )
                                      )
            Plaintiff,                )   Case No. CV05-3043-HU
                                      )
        vs.                           )
                                      )
JO ANNE B. BARNHART,                  )
COMMISSIONER, SOCIAL SECURITY         )       FINDINGS AND
ADMINISTRATION,                       )     RECOMMENDATION
                                      )
            Defendant.                )
_____)

Gala Wright
8038 Hale Way
White City, Oregon 97503
        Pro se

Karin J. Immergut
United States Attorney
District of Oregon
Neil J. Evans
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

1   - FINDINGS AND RECOMMENDATION

Richard A. Morris
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104
        Attorneys for defendant

HUBEL, Magistrate Judge:

        Claimant Gala Wright brought this action under § 405(g) of the Social Security Act (the Act) to obtain judicial review of a final decision of the Commissioner of Social Security (Commissioner), denying her request for Disability Insurance benefits (DIB) under Title II of the Act and Supplemental Security Income (SSI) benefits under Title XVI of the Act.

### Procedural Background

        Ms. Wright filed an application for benefits on June 11, 2002, alleging disability since November 27, 2001, as the result of a stroke, fibromyalgia, and musculoskeletal problems. Her application was denied initially and on reconsideration. A hearing was held before Administrative Law Judge (ALJ) Jean Kingrey on January 15, 2004. Ms. Wright appeared at the hearing, unrepresented. Also testifying were Ms. Wright's mother and daughter and a vocational expert (VE) called by the Commissioner. On August 26, 2004, the ALJ issued a decision finding Ms. Wright not disabled. The Appeals Council denied Ms. Wright's request for review.

## Factual Background

Born November 29, 1965, Ms. Wright was 38 years old at the time of the ALJ's decision. She has a college education. Her past relevant work is as a seller and manager in retail sales, a residential treatment counselor, a server, and a technician in a foreign language department.

## Medical Evidence

On January 31, 2000, Ms. Wright was admitted to Rogue Valley Medical Center's emergency room after saying she had drunk a six-pack of beer and ingested BuSpar, Pyridium, Sporanox, benadryl, meclizine and some nonsteroidal anti-inflammatory drugs. Tr. 116-19. Laboratory studies done that date were negative for drug screen, but positive for alcohol. Tr. 117. She said she had recently started using alcohol on a daily basis, after being clean and sober for the previous 10 years, tr. 116, but she also said she had been hospitalized in July 1999 for acute intoxication. Tr. 119. Ms. Wright was currently taking BuSpar to manage anxiety. Tr. 119. She was urged to obtain treatment for management of alcoholism and counseling for issues of depression and family problems. Id.; tr. 133. She denied previous suicide attempts. Tr. 117.

A psychiatric consultation done by Abraham Genack, M.D., on February 1, 2000, resulted in diagnoses of adjustment disorder with mixed disturbance of emotion and conduct; anxiety disorder;

and alcohol abuse. Tr. 119-20. Her psychosocial stressors were rated as moderately severe, as she was a single mother of a five-year-old and a 13-year-old, with a full-time job. Tr. 119.

On April 23, 2000, Ms. Wright was admitted to the Rogue Valley Medical Center's FASTrac area after being punched in the jaw and kicked in the back by an individual who was her husband or her boyfriend, who then left the house. Tr. 172. She did not report the incident to the police.  Physical examination revealed a small intraoral laceration on the left cheek, bony tenderness of the right lower jaw, and tenderness over the mid-thoracic spine. X-rays showed no acute fractures or dislocations. Tr. 173. Ms. Wright was urged to report the abuse to the police. Id. She was discharged, but returned to the emergency room after ingesting an unknown amount of alcohol, Buspar and Sporanox. Tr. 171. She was given orogastric lavage and placed in the hospital for further observation and psychiatric clearance. Id.

On July 27, 2000, Ms. Wright was brought to the Rogue Valley Medical Center by ambulance in a highly intoxicated state, after her 13-year-old daughter became alarmed and called 911. Tr. 162. Ms. Wright reported taking about 15 ibuprofen and 9-12 tablets of Benadryl. Id. She admitted to four shots of tequila, but her daughter said that she had drunk at least half a bottle. Blood alcohol level was 0.25. Id. Ms. Wright stated that she did not want to live, and that she thought her children would be

better off without her because she had an insurance policy for which they were the beneficiaries. <u>Id.</u>

On August 10, 2000, Ms. Wright's treating physician, Shirley Malcolm, D.O., wrote that after the suicide attempt, Ms. Wright was in counseling. Tr. 238. She had "not felt the benefit of BuSpar at this point and continues to struggle with anxiety." <u>Id.</u> Her issues stemmed from "feelings of abandonment and frustration with her divorce in which she now feels herself plummeted into poverty..." <u>Id.</u> Dr. Malcolm encouraged her to use Klonopin for anxiety on a short term basis while awaiting the benefits of BuSpar, and to continue on Celexa. <u>Id.</u> Dr. Malcolm also encouraged her to discontinue or minimize her use of alcohol, particularly with the use of Celexa and Klonopin. <u>Id.</u>

On January 13, 2001, Ms. Wright was brought into Rogue Valley Medical Center by police after threatening suicide by drinking a bottle of Drano. Tr. 159. She was discharged to family members. <u>Id.</u>

On February 7, 2001, Ms. Wright was admitted to Rogue Valley Medical Center after ingesting about 45 regular Tylenol. Tr. 148. She stated that she was not sure why she wanted to kill herself. <u>Id.</u> She had been called to testify in a case against her ex-boyfriend, for assaulting her. <u>Id.</u> She was currently taking Paxil and BuSpar. <u>Id.</u>

///

On February 13, 2001, Dr. Malcolm wrote that Ms. Wright was "having tremendous struggles with alcoholism." Tr. 236. Upon her return home after the suicide attempt, she "immediately started drinking." Id. Dr. Malcolm got Ms. Wright to agree to using Antabuse, and to commit to freedom from alcohol for a month. Id. She continued on Celexa and BuSpar. Id.

On February 27, 2001, Dr. Malcolm saw Ms. Wright for follow-up. Tr. 235. Ms. Wright was on Antabuse and had been sober for two weeks. Id. Dr. Malcom wrote that Ms. Wright was "overjoyed" at this, with improved self-esteem. Id. Dr. Malcolm encouraged her to receive counseling. Id. She was continued on Celexa and BuSpar. Id.

On April 9, 2001, Dr. Malcolm wrote that Ms. Wright's depression and anxiety were improved with the current regimen. Tr. 234. She continued to have alcohol on weekends, but "feels she is coming closer and closer to complete cessation." Id. Ms. Wright's right knee was extremely crepitant with a history of popping, clicking and giving out. Id. She was referred to an orthopedist for patellar chondrosis. Id.

On June 27, 2001, Ms. Wright had arthroscopic chondroplasty of the patellar articular surface of the right knee, performed by David L. Galt, M.D. Tr. 365, 373. Recovery from the surgical procedure was uneventful. Tr. 361-65. Dr. Galt noted that the surgical procedure was intended to "establish a better

environment for the knee so that she can successfully pursue ... rehabilitation." Tr. 372. On September 21, 2001, Dr. Galt released Ms. Wright to regular, full-time work. Tr. 362.

On November 19, 2001, Ms. Wright was admitted to Rogue Valley Medical Center after overdosing on cough syrup, Tylenol, Advil and Sudafed. Tr. 143. She reported that she was doing well until being written up at her job for an infraction she did not commit. Id. Since that time, Ms. Wright experienced increasing difficulty sleeping. Id. She drank a six-pack of beer the evening prior to her admission, and then took pills. Id.

Ms. Wright reported intermittent abuse of alcohol, although she had been alcohol-free until the recent problem with her job. Id. Ms. Wright agreed to some respite care, and to follow-up treatment with a therapist. Tr. 144. She was continued on Celexa and started on Trazodone. Id.

On November 27, 2001, Dr. Malcolm saw Ms. Wright and observed that she was "tearful most of the interview and obviously very emotional." Tr. 233. Ms. Wright stated that she felt extremely discouraged and fragile, and that she was struggling with feelings of discouragement and insomnia. Id. Dr. Malcolm's impression was "[e]xtreme depression and anxiety, tied in with a work event." Id. In Dr. Malcolm's opinion, she was in "no way fit to function currently in her job and will need

///

further counseling and a rebalance of her medication." Id. She was continued on Celexa and BuSpar. Id.

On December 18, 2001, Ms. Wright saw Dr. Malcolm, who thought anxiety was Ms. Wright's "most strongest [sic] and uncontrolled component now." Tr. 232. Dr. Malcolm thought she was not yet capable of returning to Fred Meyer, excusing her from work until January 2002. Id.

On January 22, 2002, Dr. Malcolm recorded that Ms. Wright was tearful, made poor eye contact, and was wringing her hands, but Dr. Malcolm found no defect in cognition, speech or memory and no recent suicide attempts. Tr. 230. Ms. Wright admitted to occasional use of marijuana, but denied other drugs. Id. Dr. Malcolm's impressions were increasing depression/anxiety, with no indication that Celexa was currently beneficial. Id. Dr. Malcolm started her on Effexor and, for anxiety, Klonopin. Id. She was counseled to discontinue marijuana and alcohol. Id. Dr. Malcolm noted that Ms Wright's anxiety and depression continued to be "fairly extreme. Do not see her able to RTW [return to work] and be functional." Id.

On February 5, 2002, Ms. Wright saw Dr. Malcolm, who wrote,

Although she has many complaints of physical maladies ... she continues to have tremendous anxiety... Struggling deeply with depression, anxiety and although slightly improved with recent change of medicine, i.e., to Effexor, does not seem capable of returning with any type of function to her former job. Would strongly recommend a consult with

> Psychiatry to see if indeed further counseling, change in medicine might be useful. ... Denies use currently of alcohol and marijuana but stressed how important it is that she continue to avoid these depressants. She is not involved in a support group currently nor is she willing.

Tr. 229.

On March 7, 2002, Ms. Wright began treatment with Michael Sasser, M.D., a psychiatrist, for depression. Tr. 347. Ms. Wright said she began to spiral downward about two years earlier, with interpersonal stresses and pressure on the job. Id. This culminated in an issue with a co-worker, and a charge of insubordination when she failed to follow through with something she had been asked to do. Tr. 348. Ms. Wright stated that she had been on medical leave from her job since November 2001, and that she had retained an attorney for help with employment issues.

Dr. Sasser observed that Ms. Wright was emotionally upset when discussing her work situation, but her thinking was clear, focused, and goal oriented, although "fixated on the work setting." Id. There was some tearfulness. Tr. 349. Ms. Wright described her mood as depressed and demoralized. Id. She described her anxiety as contributing to her problems with attention and concentration and a tendency to fixate on problems. Id. She did not describe any ongoing sense of panic. Id.

Dr. Sasser decided to switch Ms. Wright to an extended release version of Effexor and increased her dosage of Klonopin.

9   - FINDINGS AND RECOMMENDATION

He recommended non-pharmacologic relief, including walking half
an hour a day, making dietary changes and, possibly, making a
career change at some point after her mood improved and her
anxiety decreased. Id. Dr. Sasser diagnosed depression and
adjustment disorder with anxiety and depression.  Id.

On March 11, 2002, Ms. Wright was again admitted to Rogue
Valley Medical Center, having ingested unknown amounts of
Clonazepam, BuSpar, and Effexor, which she characterized as a
"handful of each," and alcohol. Tr. 136. Ms. Wright stated to the
admitting physician, Lester Garwood, M.D., that she took the
drugs because of depression and anxiety, and that she wanted to
harm herself because she was "tired." Id. Ms. Wright reported
three overdoses in the past two years. Id. It was noted in her
discharge summary that she had been admitted to Rogue Valley
Medical Center's psychiatric unit from February 7, 2001 through
February 9, 2001, "under fairly similar circumstances." Tr. 131.
She was currently taking BuSpar for anxiety, Effexor, and
Klonopin. Tr. 131. Dr. Garwood diagnosed adjustment disorder,
improving; dysthymic disorder, rule out major depression, rule
out mood disorder secondary to alcohol abuse; and personality
disorder. Tr. 134. She was admitted to the psychiatric unit on a
psychiatric hold. Tr. 137.

On March 14, 2002, Dr. Sasser made a note to the file with
respect to Ms. Wright's March 2002 admission to the hospital

after overdosing on medications and 88 ounces of Bud Ice. Tr.
346. Dr. Sasser wrote:

> I don't think she has any appreciation of the
> negative effect that alcohol had on her decision.
> Likewise, she has absolutely no insight into the
> negative effects it is going to have on her children.
> She presents with a tremendous amount of self pity
> and continues to wallow in how poorly she was treated
> in her work place rather than moving on with her
> life. I am going to add some Neurontin 300 mgs. three
> times a day to her Celexa which is going to help
> stabilize her mood. ... I also reminded her that her
> behaviors are very much reflected in a negative way
> by her alcohol use. ... She sort of acknowledged that
> as true but there was not a sense that she was really
> convinced of that.

Id. On March 21, 2002, Dr. Sasser wrote that Ms. Wright had

acknowledged her alcohol dependency and had stopped drinking. Id.

Dr. Sasser suggested that she reconsider suing her employer and

instead get on with her life. Dr. Sasser wrote,

> She said her parents said she should apply for
> disability. Apparently what they meant was Social
> Security Disability. I pointed out that in all
> probability she does not qualify. She is employable
> and the criteria for Social Security Disability is so
> strict that in my opinion she would not qualify and
> I think it would get her into a rut ... that would be
> detrimental in the long run.

Id. Dr. Sasser increased the Effexor to give Ms. Wright

"potential for a little bit more of the motivation, drive and

initiative aspects."

On April 4, 2002, Dr. Sasser noted that Ms. Wright's mood

"continued to be good," although she still had some anxiety. Tr.

345. He increased her Neurontin dosage. Id. She reported to him

11  - FINDINGS AND RECOMMENDATION

that she continued abstinent from alcohol and they discussed moving forward rather than wallowing in the past. Id.

On May 2, 2002, Ms. Wright saw Dr. Malcolm with complaints of impaired short-term memory, sore throat, poor sleep pattern, increased irritable bowel symptoms, numbness and tingling in the fingers and hands, muscle twitches, hot/cold intolerance and "a myriad of symptoms which she relates to having fibromyalgia." Tr. 226. Dr. Malcolm noted that Ms. Wright had "recently had a friend diagnosed with fibromyalgia and has done much reading on the computer. Certainly she is at high risk because she has had deprived sleep and difficulties managing stress and addiction in the past years." Id. Dr. Malcolm thought she "may well have fibromyalgia." Id. Dr. Malcolm also wrote,

> Patient desires SSI so that she will not need to leave her home. Feel that depression is adding to her desire for isolation. I discouraged this and feel that she needs to apply for work outside the home. ... I've encouraged her to work more with her depression and to stay involved with life outside of her home.

Id.

On June 3, 2002, Ms. Wright was admitted to the Rogue Valley Medical Center with complaints of right shoulder pain and difficulty with gait. Tr. 177. She reported having previously noted numbness and tingling about the face, blurred vision, numbness of the hands, numbness in the right arm and left leg, and difficulty walking. Tr. 179, 184. She was initially seen in

the emergency room, and admitted when neurological deficits were noted, including inequality of pupils. Tr. 177. MRI and CT scan of the brain, telemetry, and cerebral angiogram revealed a flow void to the distal right vertebral artery. Tr. 177, 196. No aneurysm or AVM was noted. The chief diagnosis was right vertebral artery dissection. Id.

After the angiogram, Ms. Wright was very intent on going home. Id. Earlier in her stay, she had been placed on Librium to help with anxiety. Id. The anxiety was noted to be a long-term disorder, possibly compounded with ongoing alcohol use. Id. After three days in the hospital, she was discharged to her family, with instructions to follow up with Dr. Malcolm in one to two weeks, and with Dr. Carlini in four to six weeks. Id. She was to continue with counseling for ongoing depression. Id.

On June 10, 2002, Dr. Malcolm recorded that Ms. Wright continued to have problems with balance, numbness and tingling in the left leg and thorax, and disturbed gait. Tr. 222. Dr. Malcolm encouraged her abstinence from alcohol and her continued efforts to stop smoking, noting that Ms. Wright had "only been able to bring down from [two packs per day] to 15, but indeed this is progress." Id. Dr. Malcolm thought Ms. Wright would not be able to function outside the home for a period of time with memory disturbances and gait disturbances, and encouraged her to apply

///

for Social Security "or some other benefit to be of assistance in the upcoming year." Id.

Dr. Carlini evaluated Ms. Wright again on June 25, 2002. Tr. 209. Ms. Wright reported that her right-sided headache had cleared completely, that her balance had improved, and that she no longer had double vision. Tr. 209. However, she continued to smoke cigarettes. Id. Her pupils were still slightly unequal, but briskly reactive, and extraocular movements were entirely intact. There was no ophthalmoplegia or nystagmus. Facial motor and sensory function were symmetrically intact, motor examination was normal, with 5/5 strength, and she was able to tandem walk both backward and forward. Id. Speech and language function were entirely intact. Id.

On July 30, 2002, Dr. Malcolm wrote a letter on Ms. Wright's behalf, stating that Ms. Wright's stroke would "impact her concentration and her ability to function, particularly in dealing with the public such as she [has] done in the past. It will impact her ability to walk with any duration and lift." Tr. 221. Dr. Malcolm stated that it was hoped the symptoms would resolve over the upcoming year, but in the interim she would need assistance. Id.

On September 3, 2002, Ms. Wright was seen by Dr. Malcolm for complaints of memory loss and continued numbness in the left foot and knee. Tr. 217. Dr. Malcolm concluded that the symptoms

were late effects of the infarct. Id. Ms. Wright had discontinued the aspirin, and was urged to continue to take it. Id. Ms. Wright stated that she had discontinued her alcohol use, but that she continued to have depression and anxiety. Id. Dr. Malcolm continued her on Effexor, which Ms. Wright said diminished her urge for alcohol and increased her ability to sleep. On September 12, 2002, Dr. Malcolm had a telephone consultation with Dr. Carlini. Id. She noted, "He feels no sense of surprise since she has late effects of her vertebral infarct." Id.

On October 28, 2002, Ms. Wright returned to Dr. Carlini. Tr. 206. Her complaints at that time were vertigo, headaches, numbness and tingling of the left arm, and fatigue. Id.

Upon physical examination, Dr. Carlini noted that speech and language function were completely intact in all respects; cognitive function was intact; extraocular movements were intact without nystagmus; facial motor and sensory function was intact; strength was 5/5 symmetrically. Id. Dr. Carlini noted "a slight, teeny bit of dysmetria[1] in the right upper extremity." Ms. Wright was able to tandem walk without difficulty. Id.

Dr. Carlini reassured Ms. Wright that he did not believe her current symptoms were the result of a new stroke, but rather that they were probably "just residual from her original stroke

---

[1] An abnormality of movement caused by cerebellar disorders. Stedman's Medical Dictionary (27th ed. 2000) at 553.

and are accentuated by her underlying anxiety." Tr. 207. Dr. Carlini strongly urged Ms. Wright to stop smoking, as this was an additional stroke risk factor, to continue taking aspirin, and to avoid extending her neck for prolonged periods of time. Id.; tr. 208. He prescribed Provigil for the fatigue. Id.

On December 24, 2002, Ms. Wright was admitted to Rogue Valley Medical Center for methamphetamine intoxication. Tr. 355. She stated that she "usually smokes it, but this time she had someone inject her with methamphetamine." Id. She had been unable to come down for the last three days, pacing and unable to sleep, and her friends called 911. Id. Ms. Wright also admitted drinking six shots of alcohol that evening. Id. According to the emergency room report, the police "found she was quite combative," as did the paramedics. She was treated at the hospital and Dr. Malcolm was called.

On December 31, 2002, Ms. Wright was given a neuropsychologic evaluation by Michael R. Villanueva, Psy. D. Tr. 248. Ms. Wright reported continued difficulties with memory and language, headaches, and problems with speech. Tr. 249. She could no longer enjoy reading because she found it very difficult. Id. Ms. Wright stated that she "sleeps too much," but that appetite was normal. She was smoking a pack of cigarettes or more per day, despite being cautioned about this. Id. She also reported consuming alcohol on an occasional basis, having had

"about four shots of whiskey last week," over a period of four hours. Id.; tr. 250.

Dr. Villanueva observed that Ms. Wright's gait was somewhat clumsy, and that she guided herself with her hand against the wall. Tr. 251. She was difficult to interview, because she was "very indirect." Id. Standardized testing was administered. Tr. 252. During the testing, Ms. Wright's affect was noted to be somewhat tense and anxious, and she was at times tearful. Id. Dr. Villanueva wrote,

> During Block Design, she became markedly upset, and quit early on the last two items. She stated, "I can't do this." She asked for a break, and she was in the restroom ... crying loudly enough that my office staff could hear her. ... She was cooperative with the testing procedure.

Id. Ms. Wright's intellect was found to be in the average range, although Verbal IQ was significantly higher than Performance IQ. Id. Working Memory and Processing Speed indices fell into the low average range. Id. On the Wechsler Memory Scale III (WMS-III), all indices were in the average to high average range, with the exception of Working Memory, which was low average, consistent with findings on the Wechsler Adult Intelligence Scale III (WAIS-III). Id. Reading was average, consistent with assessed intellect. Id.

Dr. Villaneuva concluded that for the most part,

> this is a benign cognitive examination. The patient's working memory and processing speed are a relative

> weakness, but do not fall below normal limits.
> Complicating this patient's picture is a history of
> psychiatric difficulties and substance abuse. It is
> difficult to say, at this time, if relative
> difficulties with working memory and processing speed
> are secondary to stroke, or affective difficulties.
> The patient's most significant difficulty at this
> time appears to be depression. She reports lack of
> energy, spending much time in bed, was tearful
> throughout the examination, and reports relatively
> recent psychiatric hospitalizations for depression.
> She reports having suicidal ideations in the past,
> with no firm plan.

Tr. 253.

Ms. Wright established care with Cindy Harper, FNP, on April 4, 2003. Tr. 336. Ms. Harper wrote that Ms. Wright "recently was dismissed from Dr. Malcolm's care, possibly due to noncompliance." Id. Ms. Wright reported to Ms. Harper that fibromyalgia was "diagnosed four years ago but has been much worse over the past two years and includes significant fatigue and generalized muscle pain. She is requesting a referral to a specialist for fibromyalgia." Id. [2]

Ms. Wright also reported sequelae from the stroke, including pins and needles sensation in her left leg, short term memory loss, vertigo, occasional slurred speech, and blurred vision. Id. She was currently taking Neurontin and Effexor for depression and anxiety, which she believed worked well. Id. Ms. Wright said she was pursuing Social Security disability on the

---

[2] The record does not reveal a diagnosis of fibromyalgia prior to Ms. Wright's initial visit with Ms. Harper.

basis of her stroke and fibromyalgia, but stated that "she misses work very much." Id. Ms. Wright said she was smoking less than a pack of cigarettes a day, and that she "had a problem with beer in the past prior to her treatment for anxiety. She occasionally drinks alcohol now." Id.

On June 9, 2003, Ms. Harper wrote that Ms. Wright was complaining of shoulder and hand pain after 45 minutes of sitting up reading the newspaper. Tr. 332. After a day of spot cleaning carpets, she had bilateral arm pain, mostly in the right arm and hand, and after standing for 1 1/2 hours, she had pain in her feet and legs. Id. In all instances, the pain lasted one to three days, with numbness and tingling accompanying the arm pain. Id.

Examination revealed point tenderness above the knees and above the elbows, but classic tender points for fibromyalgia were noted to be absent. Id. Despite the absence of the tender points, Ms. Harper diagnosed fibromyalgia, prescribed Neurontin and trazodone as a sleep aid, and gave Ms. Wright a book on fibromyalgia. Id.

At a follow up visit on June 27, 2003, Ms. Wright reported that she was sleeping better with the trazodone, and that she was taking her Provigil and Neurontin regularly. Tr. 331.

On June 12, 2003, Ms. Wright was seen for a vision examination by Dean Brown, O.D. Tr. 314. Dr. Brown noted that Ms. Wright reported blurred near vision. Id. On examination, Ms.

Wright was found to have best corrected visual acuity of 20/25 in each eye. Near point accommodation was deficient, but intraocular pressure was normal. Id. Pupils were equal, round, and reactive to light. Dilated retinal examination was unremarkable. Id. Dr. Brown recommended reading glasses. Id.

On August 14, 2003, Ms. Wright saw Ms. Harper to discuss disability. Tr. 330. Ms. Harper wrote that Ms. Wright "is wanting me to support her total disability." Id. Ms. Harper wrote that she told Ms. Wright

> it was my job to support her ability, not her disability. I told her I felt that perhaps temporary disability would be appropriate, until she could get her life back on track, learn some life skills, vocational rehab, and learn to deal with her fibromyalgia.

Tr. 329.

On August 22, 2003, Ms. Harper noted that she had seen Ms. Wright for evaluation of facial numbness and hand paresthesia. Id. Ms. Wright also reported numbness of the right corner of her mouth and the tip of her tongue, and vertigo with head movement, lasting 30 minutes. Tr. 329. Ms. Harper recorded that hand numbness had been "an ongoing problem that she first noticed in 1995," id., but that for the past six months she had noticed progressively worsening tingling sensations in all her fingers, extending into her arms if she raised her arms above her head. Tr. 329. The symptoms were exacerbated by use of her hands. Id.

Ms. Wright stated that her hands felt "uncoordinated and weak," and that she had difficulty opening things, picking things up, and brushing her hair. Id. She described muscle pain, but had "difficulty being specific." Id. Ms. Wright also reported numbness of both great toes and a sensation of coldness in her feet. Id.  Ms. Harper referred Ms. Wright to a neurologist, Larry J. Maukonen, M.D. Tr. 403.

Ms. Wright saw Dr. Maukonen on September 23, 2003. Tr. 403. Ms. Wright said she awoke with vertigo and numbness of the right side of her face two weeks earlier. The vertigo lasted for about an hour and a half, and the numbness had slowly improved except for slight numbness at the right corner of her mouth. Id. Ms. Wright reported that she had had problems with numbness and tingling in her hands, worse on the right, numbness at the medial tip of both big toes, pain in the arms and hands and, less so, in her neck, shoulders and legs. Id.

Ms. Wright told Dr. Maukonen that she had developed pain in her muscles approximately 10 years previously, when she was doing bodybuilding. Id. She had stopped lifting weights completely seven years earlier, but the pain had continued and become worse. Id. Ms. Wright stated that she had been told she "probably has fibromyalgia." Id.

Ms. Wright reported that the problems with numbness and tingling in her hands had begun in 1995, but had not been

evaluated. Id. She said she had her first episode of vertigo in November 1999, after being punched in the jaw by her boyfriend in the summer of 1999.[3] Id.

Ms. Wright related that between the time she was assaulted by her boyfriend in 1999 until her stroke, she had attempted suicide four times. Tr. 404. She stated that she was not depressed at that time, but just "in a lot of pain and was trying to get treatment for her pain." Id. She was currently on Neurontin and ibuprofen, but "still has a lot of pain." Id. She got the best relief from her pain by lying down. Id. She had stopped taking antidepressants in January 2003, but was taking trazadone to help her sleep and Provigil to "help her be alert during the daytime." Id. Ms. Wright also reported that she had surgery for torn cartilage in her right knee in 2001, but that she "continues to have pain in both knees." Id.[4]

In addition to complaints of pain, numbness, tingling and episodic vertigo, Ms. Wright reported that she had recently experienced increasing shortness of breath and intermittent diarrhea. Id. She said she had been told that she had irritable bowel syndrome. Tr. 405. She reported recurrent kidney infections

---

[3] It is not clear from the record whether Ms. Wright is mistakenly referring to the assault by her husband, for which she was admitted to the hospital on April 23, 2000, or a different, earlier assault.

[4] The record reveals no condition in Ms. Wright's left knee which would cause her to "continue" to have pain there.

and also stated that she had had problems with her memory since her stroke. Id.

Physical examination was unremarkable except for some limitations on range of motion. Id. Ms. Wright reported pain in her proximal arms with her arms extended and tenderness in her paracervical, superior trapezius and medial scapular muscle groups, extending down over her upper arms and forearms. Id. She had positive Tinel's sign over the carpal tunnel bilaterally, but negative Tinel's over the radial and ulnar nerves at the wrists and ulnar nerve at the elbows. Tr. 406. There was some tenderness over her calf bilaterally. Id. Motor strength was 5/5 in the upper and lower extremities with "intermittent giveway weakness with associated pain complaints." Tr. 406. No atrophy or fasciculations were seen, and muscle tone was normal. Id.

Dr. Maukonen's diagnoses were post right vertebral artery dissection; bilateral carpal tunnel syndrome; chronic muscle pain that "probably represents fibromyalgia," and "[p]ossible right thoracic outlet syndrome secondary to #3 [i.e., the chronic muscle pain]." Tr. 407.

Dr. Maukonen knew of "no other workup or treatment that needs to be done for her occluded vertebral artery," except lying down and elevating her feet if she became dizzy. Id. Dr. Maukonen concluded,

///

> Relative to her carpal tunnel syndrome, her latencies
> are only borderline to minimally prolonged at the
> wrists. I gave her splints to wear and she states
> that these feel good. ... Relative to her muscle
> pain, I elected to try increasing the trazadone to 50
> mg. at bedtime. ... I also suggested that she use
> heat and do gentle stretching exercises.

Tr. 407.

On January 16, 2004, Ms. Wright saw Dr. Maukonen for follow-up. MRI and MRA scans done on December 11, 2003, to evaluate her right cerebellar stroke and right vertebral artery occlusion showed that the stroke was less prominent than before, and there were no new strokes present. Tr. 341. She continued to have absence of her right vertebral artery, but her vessels were otherwise normal. Id. Ms. Wright complained of continued vertigo and ataxia, saying she needed to hold on to things while walking and that at times, she had to lie down because of dizziness. Id. She was currently using a cane, id., though there is no indication in the record that the cane had been prescribed for her.

Dr. Maukonen recorded that Ms. Wright also had bilateral carpal tunnel syndrome, though she was getting relief from pain in numbness with the use of wrist braces. Id.

Dr. Maukonen noted that Ms. Wright said she continued to have pain from fibromyalgia, worse since being off Neurontin.[5] Id.

---

[5] It appears that the Neurontin was discontinued because the Oregon Health Plan refused to pay for it. Tr. 341.

Dr. Maukonen had previously started Ms. Wright on Vistaril, which Ms. Wright was able to take at bedtime for help sleeping. She was also taking trazadone at bedtime and Provigil each morning. Id. Dr. Maukonen told Ms. Wright he had no treatment for her symptoms other than rest. Tr. 342.

On examination, extraocular movement was full range without nystagmus; she had no facial asymmetry; speech was normal; finger-to-nose was done slowly and without tremor; fine and rapid alternating movements and foot tapping were slightly slow and clumsy on the right as compared to the left; she stood and ambulated with a wide-based gait and used a cane in her left hand; and she was wearing bilateral wrist splints for carpal tunnel syndrome. Tr. 342.

An MRI of the brain done on December 9, 2003, showed that ischemic changes in the right inferior cerebellar hemisphere had completely resolved, with the exception of a small area of residual T2 hyperintensity. Tr. 343. Otherwise, the scan was within normal limits. Id. An angiogram of the brain done on the same day showed no significant change when compared to the examination of June 2002. Tr. 344.

On March 17, 2004, Ms. Wright was given a neuropsychological evaluation by Edwin Pearson, Ph.D. Tr. 379. Ms. Wright told Dr. Pearson that she believed she was having symptoms of fibromyalgia as early as 1999, but that the condition

25  - FINDINGS AND RECOMMENDATION

had been diagnosed four years earlier. Id. She reported chronic pain and fatigue as the most debilitating symptoms, describing an overall dull pain throughout her body, exacerbated by any kind of activity. Id. She stated that by two in the afternoon, she began to tire.

With respect to the residuals from her stroke, Ms. Wright stated that she still experienced some ataxia in ambulation, although this was improving. Id. She also reported blurred vision after reading or working on a computer for extended periods of time, and pain from carpal tunnel syndrome in the right hand. Tr. 381.

Ms. Wright said she currently takes Neurontin, 600 mg. three times a day, to reduce pain and improve her energy level.[6] She also takes trazadone at night for sleep. Id. Ms. Wright said that in early 2003, she stopped taking psychiatric medications, feeling that what the doctors consider to be depression is stress associated with pain and fatigue. Id. Ms. Wright did not view herself as depressed and did not feel that she experienced untoward anxiety. Id. She also thought there had been considerable improvement in her cognitive functions since she began taking Provigil and Neurontin. Id.

_____

[6] She told Dr. Pearson that the Neurontin was discontinued in November and December of 2003 and for part of January 2004 because the Oregon Health Plan would not pay for Neurontin, but this policy was changed. Tr. 381.

Ms. Wright stated that she was capable of activities of daily living if she paced herself, and could shop, budget, and plan and prepare meals. Tr. 382. She used meditation techniques on a daily basis, but did not exercise regularly because she believed that exercise "stirs up joint and myofascial pain." Id. She said she was dependent upon her mother for transportation, as she had let her license lapse and did not believe she could drive safely because of slowed reaction time and fluctuating levels of fatigue. Id.

Dr. Pearson administered several psychological tests, which revealed that Ms. Wright's intelligence was in the average to above average range, with scores somewhat higher than when she was evaluated by Dr. Villanueva in December 2002. Tr. 383-84. Her auditory memory scores were significantly higher than scores on tests of visual memory and working memory, although visual and working memory were within the average range. Tr. 384. Dr. Pearson concluded that Ms. Wright had made "considerable gains in cognitive functions" since her stroke in May 2002. Id.

Dr. Pearson's clinical impression was pain disorder, associated with both psychological factors and medical condition, chronic. Id. He found no evidence of depression or anxiety. Id. Dr. Pearson observed,

> It does not appear to this writer that Gala is as yet capable of sustaining full time employment, even in a sedentary, low stress occupation. On a good day,

> she could probably work fairly well for four to five
> hours. But even on good days she is likely to fatigue
> in the afternoon, become less efficient, with
> increased anxiety and poor coping. On bad days, which
> are unpredictable, it doesn't appear that Gala could
> complete even a part time schedule. Although bad days
> are not occurring more than a few times a month at
> this time, Gala paces herself and really does not
> have to push herself in any way. It is difficult to
> predict how long it will take for her to stabilize to
> the extent that she can work and support herself. She
> might need vocational rehabilitation assistance to
> find a vocational direction that is compatible to her
> limitations.

Id. Dr. Pearson completed a Medical Source Statement of Ability
to Do Work-Related Activities. Tr. 387-88. Dr. Pearson found Ms.
Wright to be moderately impaired in her ability to respond
appropriately to work pressures in a usual work setting, but
otherwise capable of work-related activities, except for "stamina
and endurance problems" which precluded fulltime employment. Id.
He stated that his assessment was supported by his conclusion
that

> Claimant has fibromyalgia and history of cerebellar
> stroke. She experiences chronic pain and fatigue. I
> view her as having a diminished ability to manage all
> stress and pressure.

Tr. 388. Dr. Pearson noted that Ms. Wright's "diagnoses and self
report seemed consistent," and that she was "clearly fatigued
over 2 1/2 hours at interview and evaluation."

### Hearing Testimony

Ms. Wright testified at the hearing that her 17-year-old
daughter does all the grocery shopping and much of the housework,

although Ms. Wright vacuums and mops the floors. Tr. 426. She testified that she is able to do her own grooming, tr. 426, but later stated that she was starting to lose her teeth because pain in her arms prevented her from brushing her teeth every day. Tr. 430. She continues to smoke, tr. 429, although she still wants to quit. <u>Id.</u>

Ms. Wright testified that the reason she is unable to work is that she lives with "extreme, chronic pain." Tr. 430. She stated that the stroke left her with dizzy spells often requiring her to lie down and elevate her feet. <u>Id.</u> She said she is unable to hold a pen and write or type for any length of time, and that she cannot read because her vision becomes blurry. <u>Id.</u>[7] She initially attributed the blurry vision to stroke residuals, but when the ALJ asked her whether she was using the reading glasses recommended by Dr. Brown in June 2003, Ms. Wright said she was not, because the frames had broken. Tr. 431. Ms. Wright acknowledged that her blurred vision could be corrected if she used the glasses. <u>Id.</u>

Ms. Wright said she was also unable to sit up for long. Tr. 437. She stated that severe exhaustion required her to spend most of the day in bed. Tr. 432, 437. Ms. Wright characterizes her suicide attempts as efforts to stop working, saying she was "in

---

[7] I note that Ms. Wright's brief is very well done for a *pro se* litigant, comprising 30 pages and citing 16 cases, and signed by her.

too much pain and fatigue to go to work and I don't know how to provide for my children." Tr. 437-38.

Ms. Wright's mother, Molly Gonzales, testified that Ms. Wright had "a lot of trouble in her concentration and her movements are really jerky. She's constantly knocking things down or things over." Tr. 446. Ms. Gonzales attributed this to Ms. Wright's dizzy spells and an inability to use her hands. Tr. 446. Ms. Gonzales said Ms. Wright had been "homebound since the stroke." Tr. 447. Ms. Gonzales testified that Ms. Wright's daughter does all the grocery shopping, housework and yard work, besides going to school. Tr. 450, 453. Ms. Gonzales said she handles Ms. Wright's finances. Tr. 453-54.

Ms. Wright's daughter, Meagan Wright, testified that she does the dishes because her mother "can't lift the plates up." Tr. 461. Meagan testified that her mother was unable to sit up for 30 minutes before becoming overcome with dizziness and having to lie down. Tr. 462. Meagan said she believed her mother was having "lots of mini-strokes" because

> every once in a while she'll ... wake up in the morning. She doesn't feel good and I'll check her eyes and her pupils are way too big and one's way too small. And she just can't stand up and she's running into walls and she'll have complete vertigo.

Tr. 462-63.

The ALJ called a vocational expert (VE), Kent Granat. The ALJ asked him to consider an individual of Ms. Wright's age,

30  - FINDINGS AND RECOMMENDATION

education and work experience, limited to light work without prolonged periods of extending her neck, requiring no complex tasks, no detailed instructions, no close interaction with the general public, and no concentrated exposure to hazards. Tr. 464. The VE opined that such an individual could not return to her past relevant work, but that she would be able to work as a small product assembler, small parts assembler, or basket filler. Tr. 465. When the ALJ asked the VE to consider sedentary jobs within the hypothetical, the VE supplied the jobs of surveillance system monitor. Tr. 466.

In response to the VE's testimony, Ms. Wright testified that she was unable to do any repetitive motions involving her arms and hands because it causes her to feel "like knives are stabbing in me and twisting," and because her hands "feel like they're broken." Tr. 466. Ms. Wright thought these symptoms also precluded her from working as a basket filler. Tr. 467.

The ALJ then asked the VE to identify a job that did not require more than occasional use of the claimant's arms, within the light category. Tr. 467. The VE supplied data exam clerk, a sedentary job involving reviewing the accuracy of paperwork. Tr. 468. The VE thought Ms. Wright had transferable skills for this job because she had worked as a treatment counselor, reviewing records, and as a manager, doing recordkeeping. Tr. 468.

///

31  - FINDINGS AND RECOMMENDATION

**ALJ's Decision**

The ALJ found that Ms. Wright had 1) an occluded distal right vertebral artery, status post cerebellar infarct due to traumatic dissection to that artery in June 2002; 2) carpal tunnel syndrome; 3) status post arthroscopic retinacular release on the right knee in June 2001; and 4) depression with anxiety and intermittent polysubstance abuse, all of which the ALJ rated as severe impairments. Tr. 17.

The ALJ found that Ms. Wright did not have medically determinable fibromyalgia, having not consistently demonstrated diagnostic tender points on clinical examination. Id. The ALJ noted Ms. Wright's testimony that she had obtained information about fibromyalgia from nonmedical sources.

The ALJ found that examinations by different physicians over a period of two years after the cerebral event demonstrated that Ms. Wright had no speech, communication or motor function loss; no form of paresis, paralysis, tremor or other involuntary movement; and no sensory disturbances in any extremity for any consecutive 12-month period. Tr. 18. The ALJ found Ms. Wright's self-reported residual ataxia unsupported by recent medical evidence. However, the ALJ stated that she had incorporated a restriction limiting exposure to hazardous environments into the assessment of Ms. Wright's residual functional capacity, to ensure that any balance problems would not be dangerous. Id.

The ALJ found no medical evidence to support Ms. Wright's allegations of permanent brain injury and organic mental disorder, noting that the psychiatric, psychological and neurological evaluators identified no abnormal mental or behavioral signs correlating to organic brain dysfunction, and no discernable loss of previously acquired cognitive abilities. Id.

With respect to depression and anxiety, the ALJ concluded that Ms. Wright had mild restrictions in daily activities; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. Id.

The basis for the ALJ's findings were the ALJ's acceptance of the opinions of state agency physicians Martin Kehrli, M.D., and J. Scott Pritchard, D.O. Tr. 19. The ALJ found their opinions to be consistent with those of Ms. Wright's long-term treating physician, Dr. Malcolm. The ALJ noted Dr. Malcolm's statements in the record that, absent substance abuse, Ms. Wright was capable of working, and her discouragement of Ms. Wright's application for disability benefits based on fibromyalgia.

### Standards

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1998). However, the Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." <u>Andrews</u>, 53 F.3d at 1039-40.

The initial burden of proving disability rests on the claimant. <u>Meanel</u>, 172 F.3d at 1113; <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § ///

423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b).  If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." <u>Yuckert</u>, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of
> impairments which significantly limits your physical
> or mental ability to do basic work activities, we
> will find that you do not have a severe impairment
> and are, therefore, not disabled. We will not
> consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. <u>Yuckert</u>, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments

that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. Yuckert, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other work in consideration of the claimant's age, education and past work experience. Yuckert, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

### Discussion

**1.    Additional evidence submitted by claimant and Commissioner's objection**

Ms. Wright submitted with her complaint four sets of documents, identified as Exhibits 1-4. She submitted five additional documents attached to her opening brief, identified as Exhibits 5-9. Some of these exhibits are part of the

administrative record (Exhibit 2, Exhibit 3, pages 1, 2, 3 and 4;
Exhibit 4, pages 3 and 4), but the other documents are not part
of the administrative record (Exhibit 1, Exhibit 3, page 5;
Exhibit 4, pages 1 and 2; Exhibits 5-9)[8]. In her brief, the
Commissioner objected to the inclusion of these documents,
arguing that the court's consideration of documents not included
in the administrative record, and therefore not before the
Commissioner, would require the court to make findings of fact,

---

[8]Exhibit 1 is a letter to Ms. Wright from Mary Moak,
Compensation Team Member of Fred Meyer, dated March 12, 2002, and
stating that Ms. Wright's medical leave requests exceed the 26 week
maximum permitted by state and federal leave laws and Fred Meyer's
medical leave policy. The letter states that if Ms. Wright is
unable to return to work, with or without accommodations, by May
20, 2002, Fred Meyer will consider it a voluntary resignation.
Exhibit 3, page 5 is an application for loan discharge, based on
total and permanent disability, dated January 20, 2005. The bottom
of the application contains a statement, dated January 25, 2005,
from Dr. Maukonen, stating that Ms. Wright has a medical condition
which began about May 27, 2002, which precludes her from being able
to work and earn money in any capacity. Exhibit 4, pages 1 and 2 is
a letter addressed to Molly Gonzales, Ms. Wright's mother, signed
by ALJ Kingrey, enclosing additional evidence obtained by the
Commissioner, from Rogue Valley Medical Center and Michael Sasser,
M.D., that the ALJ proposes to enter into the record. Exhibit 5 is
copies of two disability certificates, signed by Dr. Malcolm and
dated December 18, 2001 and February 5, 2002, respectively. Exhibit
6 is a Notice of Loan Discharge from Federal Student Aid, notifying
Ms. Wright that her educational loans were discharged on September
30, 2005, due to total and permanent disability. Exhibit 7 is a
partial copy (undated and unsigned) of a Supplemental Judgment with
a Child Support Award from the Circuit Court for Jackson County
awarding child support to Ms. Wright. Exhibit 8 is a log of
telephone calls from Ms. Wright to unidentified doctors with dates
in 1999. Exhibit 9 is a heavily redacted letter from Gala Wright to
ALJ Kingrey, dated March 12, 2004, requesting a copy of the
recording of the hearing on January 15, 2004, and protesting the
Commissioner's having forwarded her medical records to her mother
without her prior approval.

which is beyond the scope of the court's review.

In her reply brief, Ms. Wright submitted additional documents, identified as Exhibits 10 and 11.[9] The Commissioner then filed a motion for leave to file a sur-reply, in order to address the new evidence submitted with the reply brief (doc. # 15).

"As in other administrative law contexts, judicial review of cases brought under the Social Security Act is limited to a review of the administrative record for a determination of whether the Commissioner's decision is supported by substantial evidence in the record." Harman v. Apfel, 211 F.3d 1172, 1177 (9th Cir. 2000). With the exception of those documents, identified above, that are already part of the administrative record, I recommend that Exhibits 1-11, attached to Ms. Wright's briefs, be disregarded as outside the scope of the court's review. I recommend further that the Commissioner's motion for leave to file a sur-reply, in order to address Exhibits 10 and 11, be denied as moot.

Wright concedes that the diagnosis of fibromyalgia by nurse

---

[9]Exhibit 10 is two letters from Dr. Malcolm to Ms. Wright, the first dated November 12, 2002, stating that Ms. Wright missed an appointment on November 12, 2002, and advising her that continued negligence in making and keeping appointments "may cause us to ask you to seek medical care elsewhere," and the second dated December 13, 2002, stating that her office is withdrawing from her further professional care. Exhibit 11 is pages two and three of a Loan Discharge Application.

practitioner Cindy Harper is not sufficient to support the existence of that condition because Ms. Harper is not a medically acceptable source within the meaning of the regulations, 20 C.F.R. 404.1513.

**2.    ALJ's acceptance of opinions of reviewing Doctors Kehrli and Pritchard**

Ms. Wright contends that the ALJ's decision is "premised exclusively" on the reports of Doctors Kehrli and Pritchard, nontreating, nonexamining state agency consultants. Ms. Wright takes issue with their findings that Ms. Wright showed no evidence of knee problems; that Ms. Wright had no vision limitations and no push/pull limitations; that she is capable of lifting and carrying 20 pounds; and that she is able to walk/sit/stand for six hours out of an eight hour work day.

It is Ms. Wright's burden to prove the existence of a medically determinable physical impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The evidence before the court shows that Ms. Wright had surgery on her right knee in June 2001. Nothing in the record suggests torn cartilage, although the record does reflect the development of cartilage under the right patella, which was removed arthroscopically and uneventfully. Dr. Galt released Ms. Wright to return to regular full-time employment on September 21, 2001. There is no indication in the

record that Ms. Wright returned to Dr. Galt with additional complaints about her right knee or made complaints about her right knee to other medical practitioners. An impairment that has been stabilized or corrected will not support a finding of disability. <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir. 1992).

There is no medical evidence of an impairment to Ms. Wright's left knee.

With respect to vision limitations, Ms. Wright argues that Dr. Maukonen attributed Wright's intermittent blurring of vision to her stroke. However, the MRI of the brain and brain stem done in December 2003 showed that the ischemic changes in the right inferior cerebellar hemisphere caused by the stroke were completely resolved, except for "minimal" nonspecific areas of T2 prolongation. Otherwise, the scan was within normal limits. Tr. 343. In any event, regardless of this evidence, Ms. Wright acknowledged at the hearing that her complaints of blurry vision while reading  would be resolved if she wore her reading glasses. An impairment that can be corrected or controlled cannot support a finding of disability. <u>Celaya v. Halter</u>, 332 F.3d 1177, 1185 (9th Cir. 2003)(Rawlinson, J., dissenting); <u>Sample</u>, 694 F.2d at 642.

With respect to push/pull limitations and the ability to lift or carry 20 pounds, while the medical evidence does show

40  - FINDINGS AND RECOMMENDATION

that Ms. Wright complained of numbness of the hands, numbness in the right arm and left leg, and difficulty walking in June 2002, when her stroke was diagnosed, physical examinations by neurologists between June 2002 and January 2004 provide no clinical findings to support the existence of a condition that could cause Ms. Wright's complaints of vertigo, disturbed gait, numbness and tingling of the arms and legs, blurred vision, and numbness of the face. See, e.g., tr. 209 (Dr. Carlini's examination of June 25, 2002, in which Ms. Wright's pupils were briskly reactive and extraocular movements entirely intact, facial motor and sensory function were intact, motor examination was normal, with 5/5 strength, with Ms. Wright able to tandem walk both backward and forward); tr. 206 (Dr. Carlini's examination of October 28, 2002, in which extraocular movements were intact without nystagmus, facial motor and sensory function was intact, motor examination was normal, strength was 5/5 symmetrically and Ms. Wright was able to tandem walk without difficulty); tr. 405 (Dr. Maukonen's examination of September 23, 2003, which was unremarkable except for some limitations on range of motion; strength was 5/5 in the upper and lower extremities except for "intermittent giveway weakness with associated pain complaints," and muscle tone was normal).[10] Moreover, Dr. Maukonen

---

[10] At this examination, unlike the three preceding ones, Ms. Wright was observed to be using a cane (apparently unprescribed), and standing and ambulating with a wide-based gait. Tr. 342. There

noted that the MRI and MRA scans done in December 2003 indicated that the occlusion caused by the 2002 stroke was *less prominent* in those studies than in previous studies, and that there were no new strokes present. Thus, there is no evidence from which to infer that Ms. Wright's stroke symptoms worsened at some point after the normal physical examinations of late 2002 and 2003.

The only clinical findings that support Ms. Wright's alleged symptoms are the existence of carpal tunnel syndrome in both wrists. However, nerve conduction studies demonstrated only "borderline to minimally prolonged" latencies, tr. 407, and Dr. Maukonen wrote in January 2004 that Ms. Wright reported that wrist braces had relieved much of the pain and numbness in her fingers. Tr. 341. See <u>Sample</u>, 694 F.2d at 642.

With respect to Doctors Kehrli and Pritchard's findings that Ms. Wright could sit, walk and stand for up to six hours of an eight hour day, there is no clinical evidence of an impairment that would reasonably be expected to prevent Ms. Wright from sitting, walking, or standing for extended periods.

Ms. Wright argues that the ALJ should have considered the findings of Doctors Villanueva and Pearson in determining whether the chronic fatigue she reported was a consistent, reasonable and expected symptom of her permanently occluded right artery.

---

is nothing in Ms. Wright's medical records to indicate why Ms. Wright's ambulation was observed to be normal in late 2002 and early 2003, but abnormal in September 2003.

However, Doctors Villanueva and Pearson are psychologists, and thus not qualified to determine the physiological basis for Ms. Wright's complaints of fatigue.

### 3. ALJ's failure to accept Dr. Pearson's findings

Ms. Wright asserts that the ALJ erred in rejecting Dr. Pearson's opinion that she was unable to work. The ALJ rejected Dr. Pearson's opinion because it was based on an "unfounded physical condition," i.e., Ms. Wright's symptoms based on her undiagnosed fibromyalgia, and because Dr. Pearson's mental status examination was unremarkable. I find no error in the ALJ's rejection of Dr. Pearson's opinion for these reasons.

A claimant's testimony about pain and other symptoms may be disregarded if it is unsupported by medical evidence which supports the *existence* of such pain, although the claimant need not submit medical evidence which supports the *degree* of pain. Bunnell v. Sullivan, 947 F.2d 341, 347 (9th Cir. 1991)(en banc). Ms. Wright concedes that she has not been diagnosed with fibromyalgia by a medically acceptable source. But Dr. Pearson's opinions are clearly based on the assumption that Ms. Wright has fibromyalgia, and on his acceptance of her self-reported symptoms, particularly chronic pain and fatigue.

The ALJ is correct that Dr. Pearson's mental examination of Ms. Wright was benign: her intelligence was average to above average, her visual, working and auditory memory were normal, she

43 - FINDINGS AND RECOMMENDATION

had made "considerable gains in cognitive functions" since the
stroke, and there was no evidence of depression or anxiety. Dr.
Pearson's conclusion that Ms. Wright was not capable of
sustaining full-time employment is clearly based on Ms. Wright's
reported fibromyalgia symptoms, as he notes that on "good days,"
she would become fatigued and less efficient as the day went on,
with "increased anxiety and poor coping," and that on "bad days,"
she would not be able to complete even a part-time schedule.

**4.    ALJ's finding that limitations from the stroke
       improved within 12 months**

Ms. Wright challenges the ALJ's finding that the medical
records after July 2002 establish that the limitations imposed by
Ms. Wright's stroke improved within 12 months, consistent with
the residual functional capacity assessments of Doctors Kehrli
and Pritchard. She relies on Dr. Malcolm's chart note that Ms.
Wright reported continued numbness, memory and thinking problems,
an increase of difficulty with word selection and an increase in
fatigue on June 6, 2002, tr. 220, and on a note in Dr. Malcolm's
file, dated September 12, 2002, to the effect that Dr. Malcolm
has discussed Ms. Wright's memory loss with Dr. Carlini and he
"feels no sense of surprise since she has late effects of her
vertebral infarct." Tr. 217. However, the fact that Dr. Carlini
would not be surprised if Ms. Wright were experiencing memory
loss on June 6, 2002, has little weight because of the contrary

later findings by psychologists Villanueva and Pearson. In December 2002, Dr. Villanueva's testing showed that Ms. Wright's working memory and processing speed were within normal limits. In March 2004, Dr. Pearson's testing revealed that Ms. Wright's auditory, visual and working memory were all within average range, and that she had made "considerable gains in cognitive functions" since the stroke. I find no error.

### 5. Falsification of reports from Rogue Valley Medical Center

Ms. Wright claims that Rogue Valley Medical Center records have been falsified and that the opinion evidence of the emergency room physicians should be disregarded. Ms. Wright asks the court to exclude all physician opinion evidence submitted by Rogue Valley Medical Center.

The scope of the court's review is limited to reviewing the administrative record and making a determination of whether the Commissioner's decision is supported by substantial evidence in that record. The court is not authorized to make findings of fact or evidentiary rulings with respect to the administrative record. Accordingly, the court has no power to exclude evidence from the administrative record.

Further, I find no indication that the Commissioner relied on opinion evidence of the emergency room physicians at Rogue Valley Medical Center in making her determination that Ms. Wright

was not disabled. Nor did the Commissioner make a finding with respect to the effect of substance abuse on Ms. Wright's disability claim.

### 6. Improper credibility findings

Ms. Wright asserts that the ALJ gave improper reasons for discrediting the testimony of her lay witnesses, Molly Gonzales and Megan Wright, and that the ALJ improperly disbelieved her own testimony. Lay testimony as to a claimant's symptoms is competent evidence which the Secretary must take into account, Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993) unless he expressly determines to disregard such testimony, in which case "he must give reasons that are germane to each witness." Id.

The ALJ is entitled to make a credibility assessment of claimant's testimony. Polny v. Bowen, 864 F.2d 661 (9th Cir. 1988). If a claimant proves the existence of an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering. Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996). However, a claimant's testimony about pain and other symptoms such as fatigue and dizziness may be disregarded if it is unsupported by medical evidence which supports the *existence*

///

///

of such symptoms. Bunnell v. Sullivan, 947 F.2d 341, 347 (9th
Cir. 1991)(en banc). As discussed, the objective clinical
evidence does not demonstrate that Ms. Wright suffers from
fibromyalgia or musculoskeletal problems. She has no diagnosis of
fibromyalgia based on medically accepted criteria.[11] There is no
objective clinical evidence that her claimed symptoms of stroke
sequelae, such as blurred vision, dizziness, memory loss,
cognitive deficits, loss of balance, or poor coordination are
continuing. There is nothing to support her claimed connection
between recurrent kidney infections and her stroke. The evidence
shows that Ms. Wright's blurred vision can be corrected with
reading glasses and that her carpal tunnel syndrome is relieved
by the use of wrist braces. Because Ms. Wright has not
demonstrated the existence of an impairment which could cause the
chronic pain, fatigue, and other symptoms she alleges, the ALJ
was not required to accept her testimony.

The ALJ rejected Ms. Gonzales's testimony on the ground
that Ms. Gonzales had been "pushing the claimant to file for
disability." See tr. 346 (chart note by Dr. Sasser, dated March
21, 2002, stating that Ms. Wright "said her parents said she
should apply for disability.") I find no other stated reason in

---

[11] Fibromyalgia is diagnosed by firm pressure on 18 fixed
locations on the body; the rule of thumb is that the patient must
have at pain a minimum of 11 to be diagnosed as having
fibromyalgia). Rollins v. Massanari, 261 F.3d 853, 855 (9th Cir.
2001).

47  - FINDINGS AND RECOMMENDATION

the ALJ's opinion for the rejection of Mrs. Gonzales's testimony. However, Mrs. Gonzales testified to many of the same symptoms that Ms. Wright testified to, such inability to concentrate, clumsiness, dizziness and an inability to use her hands. Because Ms. Wright has not demonstrated the existence of an impairment which could cause such symptoms, the ALJ is not required to accept Mrs. Gonzales's testimony any more than she was required to accept Ms. Wright's testimony.

The ALJ rejected the testimony of Megan Wright that Ms. Wright was having "mini strokes," with dizziness and loss of balance, because it was contrary to the medical evidence that Ms. Wright had no additional strokes after the one in June 2002. I find no error in the ALJ's discounting of this testimony for that reason. Lay witnesses are not competent to testify to medical diagnoses. Nguyen v. Chater, 100 F.3d 1462 (9th Cir. 1996).

### Conclusion

I recommend that the Commissioner's decision be affirmed.

### Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due July 13, 2006. If no objections are filed, review of the Findings and Recommendation will go under advisement on that

///

///

48  - FINDINGS AND RECOMMENDATION

date. If objections are filed, a response to the objections is due July 27, 2006, and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 28th day of June, 2006.

/s/ Dennis James Hubel
Dennis James Hubel
United States Magistrate Judge